# UNITED STATES BANKRUPTCY COURT
# FOR THE
# DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re

**STACEY HUGHES-BIRCH**,                    Chapter 7
     Debtor                              Case No. 12-40781-JNF


~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**MARSHALL L. FIELD, ADMINISTRATOR**
**C/T/A OF THE ESTATE OF BARBARA TIGHE**,
     Plaintiff

v.                                          Adv. P. No. 12-4049

**STACEY HUGHES-BIRCH,**

     Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the "Amended Complaint of Marshall L. Field, Administrator C/T/A of the Estate of Barbara B. Tighe, for Determination Excepting Judgment Debt from Dischargeability" filed by Marshall L. Field ("Field" or the "Administrator"), in his capacity as an administrator of the Probate Estate of Barbara B. Tighe ("Mrs. Tighe" or the "Estate") against Stacey Hughes-Birch (the "Debtor"). Field maintains that the Debtor willfully and maliciously usurped real estate belonging to the

1

Estate resulting in a number of contempt judgments issued against her by the Essex County
Probate and Family Court Department of the Trial Court (the "Probate Court"). He seeks
an exception from discharge of the debt owed to the Estate arising from the judgments
pursuant to 11 U.S.C. § 523(a)(6). The Court conducted a trial on July 16, 2013 at which two
witnesses, the Debtor and Field, testified and nine exhibits were introduced into evidence.
Following the trial, both parties filed post-trial briefs.

The debt owed to the Estate arises from litigation spanning more than six years and
involving the filing of hundreds of documents in the Probate Court as well as in numerous
other trial and appellate courts concerning the scope of a devise to the Debtor of certain
portions of real property under Mrs. Tighe's will. The issue presented is whether the debt
owed to the Estate was caused by the Debtor's willful and malicious injury and thus should
be excepted from discharge.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 (a) and (b)
and the order of reference from the United States District Court for the District of
Massachusetts. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). The Court
now makes the following findings of fact and conclusions of law pursuant to Fed. R. Bankr.
P. 7052.

## II. FACTS AND PROCEDURAL HISTORY

The Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code on
March 1, 2012. On Schedule A - Real Property, she listed real property located at "95 Lacy
Street, North Andover, MA (as inherited per Probate Court order)" with a value of $350,000

unencumbered by any liens.  On Schedule C - Property Claimed as Exempt, the Debtor

listed the Lacy Street property as exempt pursuant to the Massachusetts homestead statute,

Mass. Gen. Laws ch. 188, § 1, in the amount of $500,000.  On Schedule F - Creditors Holding

Unsecured Nonpriority Claims, the Debtor listed a single creditor, namely Field, as

"Executor of the Estate of Barbara Tighe" as the holder of a disputed claim for $150,000.

She identified William N. Hurley, Esq., as the "Assignee or other notification for: Marshall

L. Field."

On May 2, 2012, Field, as Administrator, filed an Objection to the Debtor's claimed

homestead exemption.  Field asserted that the Debtor's homestead declaration, which was

recorded on August 19, 2011 in the Northern Essex District Registry of Deeds, was

defective because the source of the Debtor's title to the Property was identified as a "Deed"

recorded in the Northern Essex District Registry of Deeds at Book 12574, Page 275, when,

in fact, no deed had been recorded at that book and page because her interest in the Lacy

Street property was derived only from Mrs. Tighe's Estate. The Debtor filed a response,

and the Court conducted a hearing on July 10, 2012.  The Court overruled Field's Objection

by Order dated August 20, 2012, ruling that a deed is not required to establish the Debtor's

interest in the Lacy Street property under the Massachusetts homestead statute.

On May 2, 2012, Field also filed a timely complaint for a determination of the

nondischargeability of the debt owed to the Estate pursuant to 11 U.S.C. § 523(a)(6).  He

filed an amended complaint (the "Complaint") the following day which was the subject of

the July 16, 2013 trial.  Field later filed a Second Amended Complaint on June 4, 2012,

3

without leave of Court, in which he purported to add a claim for denial of the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(2)(A).  The Debtor filed a Motion to Strike that count which the Court allowed on August 3, 2012.  On June 13, 2012, Field, on behalf of the Estate, timely filed a proof of claim asserting a general unsecured claim for $187,050 based upon "Judgment 3/23/10 Essex Probate Ct. Docket 04E0083."

The Court issued a Pretrial Order on August 6, 2012 requiring, among other things, that the parties file a Joint Pretrial Memorandum, which they did on December 3, 2012.  In the Joint Pretrial Memorandum, the Debtor identified a number of proposed exhibits she planned to introduce at trial, including copies of Mrs. Tighe's will and codicils as well as pleadings and transcripts of proceedings previously litigated in the Probate Court, as well as other courts, in the protracted litigation between the Estate and the Debtor.  Under the heading "Issues of Fact Which Remain to be Litigated," the Debtor included factual issues concerning the scope of the devise to her under Mrs. Tighe's will as well as issues relating to the conduct of Field as Administrator of the Estate.

On July 15, 2013, Field filed a Motion in Limine in which he asserted that all prepetition actions between the parties concerning Mrs. Tighe's devise to the Debtor had been resolved by judgments which were affirmed on appeal, and that the Debtor's plans to proffer certain exhibits and testimony at trial, as set forth in the Joint Pretrial Memorandum, were an attempt to impermissibly relitigate issues resolved by the Probate Court and an attempt to collaterally attack its final orders.  The Court heard the Motion in Limine on July 16, 2013, immediately prior to the trial.  The Court ruled that the various

4

judgments of the Probate Court which set forth, among other things, the amount of land inherited by the Debtor from Mrs. Tighe, the Debtor's liability for contempt and the amount of the debt owed by her to the Estate were final orders and were binding on this Court. The Court prohibited the Debtor from introducing any evidence to challenge those judgments under principles of collateral estoppel, *see* Grogan v. Garner, 498 U.S. 279 (1991), the Full Faith and Credit Act, 28 U.S.C. § 1738, and the Rooker-Feldman doctrine. The sole issue for trial, the Court ruled, was whether the debt owed to the Estate, as determined by the Probate Court, should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(6). The Court also reiterated its dismissal of the count for denial of the Debtor's discharge contained in the second amended complaint as it was "incomprehensible, poorly pled and failed to state a claim under § 727(a)(2)(A)."

### III. FACTS ADDUCED AT TRIAL

To establish the debt owed to the Estate, Field introduced a number of judgments, memoranda and orders issued by the Probate Court between January 29, 2004 and May 27, 2010. The specific details of the protracted litigation, discussed below, were extracted from those documents, as supplemented by the testimony of the witnesses at trial.

Mrs. Tighe died on November 6, 2002. At the time of her death, she owned approximately eleven (11) acres of land containing at least one dwelling house, barn(s), sheds, stables and a riding ring located on Lacy Street in North Andover, Massachusetts (the "Property") which she operated as a farm. The Debtor first met Mrs. Tighe in 1965, when she was five years old, through her father who boarded horses on the Property. The

Debtor worked for Mrs. Tighe while she was growing up, doing farm work and taking care of horses. The Debtor graduated from high school, attended college for two years, and worked for an insurance company for twenty years while continuing to work with horses on Mrs. Tighe's farm. She helped Mrs. Tighe, who had two children, and her companion, Eddie, when they both became ill and disabled in the late 1990s, and she did so without compensation. In or around 2001, Mrs. Tighe approached the Debtor about living in her house and taking control of the farm after she died, explaining that she did not wish to leave the Property to her children who would not "keep it a farm."

Mrs. Tighe died on November 6, 2002, and Eddie passed away a week later. Mrs. Tighe left a Last Will and Testament dated September 14, 1999, a Codicil dated October 12, 2000 and a Second Codicil dated September 20, 2002 which was executed six weeks prior to Mrs. Tighe's death (hereinafter, the "Will"). Following a will contest initiated by Mrs. Tighe's daughter, the Will was admitted to Probate in an action in the Probate Court entitled *In re Estate of Barbara B. Tighe*, Docket No. 02P2876EP1 (the "Will Contest").

Pursuant to a Judgment issued by the Probate Court on January 29, 2004 (Manzi, J.) Field and Edward F. Finnegan ("Mr. Finnegan"), now deceased, were appointed as Co-Administrators of the Will (jointly, the "Administrators"). Admission of the Will into probate effected a devise to the Debtor of:

> . . . that certain parcel of real estate now occupied by me as my residence, with the barn and other appurtenances and improvements attached in connection therewith, located in the Town of North Andover and situated on Lacy Street, . . . and **being a portion of that land** described in a certain Deed dated December 21, 1967 . . . intending to include **no less than three (3) acres**

6

**of land**, upon which my home with attached barn is located and which parcel shall also include the hill behind such home with barn.  It is my intention to have this parcel surveyed for a more definite description.

(emphasis added).[1]

No survey was conducted and no "definite description" of the Debtor's devise was prepared prior to Mrs. Tighe's death.  The Probate Court, however, directed in the January 29, 2004 Judgment that a survey be commissioned and conducted "to determine the least amount of land in excess of a minimum of three acres . . . in order to establish a lot consistent with applicable Zoning regulations, inclusive of Barbara B. Tighe's Home with attached barn and inclusive of the hill behind said home with barn."   In other words, the Probate Court determined that the Debtor had rights in approximately 3 acres of the Property, with the remainder being the Estate's portion.  The vague and imprecise language of the Will and the confusion resulting from the absence of a barn attached to Mrs. Tighe's house created an ambiguity about which outbuildings were intended to be given to the Debtor.

In 2004, the Debtor, her husband and two daughters moved into the main house, formerly occupied by Mrs. Tighe, despite the ongoing litigation and the lack of finality with respect to the boundaries applicable to her portion of the Property.   The water and electricity she used came from lots which were later determined by the Probate Court to belong to the Estate and not the Debtor.  At some point, Mr. Finnegan advised her that she

---

[1] Although it is unclear from the record, it appears that the above quoted granting language comes from paragraph thirteenth of the original will, as amended by paragraph fourth of the Second Codicil.

7

could only have access to the house, and not other portions of the Property, and he directed that padlocks be placed on the Property's other buildings including the barn where she kept her horses.  In response, the Debtor testified that she "had to climb over a wall to get to the barn where my horses were."

Following the admission of the Will into Probate and the Debtor's use of various lots on the Property, a dispute arose among the Debtor, the Administrators and the putative heirs of the Estate concerning what portion of the Property and which specific buildings were included in the grant to the Debtor.  The parties were unable to agree on these issues. This dispute over the ambiguous description of the devise to the Debtor, which was not sufficiently clarified by the January 29, 2004 Judgment, spawned litigation in the Probate Court, the Essex County Superior Court, the Massachusetts Land Court, and the United States District Court for the District of Massachusetts which continued in some form until at least 2010.

On November 15, 2004, the Administrators initiated suit against the Debtor in the Probate Court in an action entitled *Edward F. Finnegan and Marshall L. Field, Co-Administrators of the Estate of Barbara Tighe v. Stacey Hughes-Birch*, Docket No. 04E0083-GCI through the filing of a "Complaint for Instructions." In that complaint, the Administrators requested that the court determine, *inter alia*, the area of land and the buildings devised to the Debtor pursuant to the January 29, 2004 Judgment, the portion of the Property the Debtor could continue to use and occupy, and the pro rata share of real estate taxes owed by the Debtor.

8

On December 1, 2004, the Administrators filed a "Motion for Determination" in the Probate Court through which they asserted that the parties were unable to agree what land and buildings on the Property were devised to the Debtor and which buildings she was entitled to use pending resolution of the case. The Debtor opposed the Motion for Determination. On December 23, 2004, the Probate Court entered an Order on the Motion for Determination, finding that the words "attached barn" utilized in the Will referred to the structure known as the "shed" located on Lot #2, but encroaching on Lot #3 of a 1989 subdivision plan.[2] The court further ordered that a survey be conducted to determine the land to which the Debtor was entitled and that she was to have continued use of the building identified as the shed and, with the approval of the Administrators, could continue to utilize the barn, located on Lot #3, pending completion of the survey and resolution of the Complaint for Instructions. The Debtor filed a Motion for Clarification of the December 23, 2004 Order which the Probate Court denied.

Following the December 23, 2004 Order, further litigation between the parties ensued. On February 18, 2005, the Administrators filed a "Motion to Vacate" through which they sought to compel the Debtor to vacate the barn located on Lot #3 of the 1989 subdivision plan because she was using it without their approval as required by the December 23, 2004 Order. The Debtor opposed the Motion to Vacate. She also sought the

---

[2] As discussed below, the 1989 subdivision plan was later replaced by a survey commissioned by the Administrators and approved by the Probate Court in 2006 which renumbered the Debtor's portion of the Property as Lot 2A. Before that determination, the Debtor apparently was authorized to use Lot #2 and not Lot #3 owned by the Estate, as delineated in the 1989 subdivision plan.

appointment of a Commissioner to conduct a survey, arguing that she had used the barn located on Lot #3 for ten years and that the "only logical interpretation on [Mrs. Tighe's] Will was that she intended to include Lot#2 and Lot #3, with appurtenances, in the devise to [her]." On March 9, 2005, the Probate Court allowed the Administrators' Motion to Vacate and ordered that the Debtor "shall forthwith vacate the premises identified as Lot 3 and [sic] Existing Barn upon such Lot, except that portion of Lot 3, upon which the Shed (located primarily on Lot 2) encroaches." The court denied the Debtor's request for the appointment of a Commissioner and ordered the Administrators to promptly complete a survey, which they had previously commissioned, to define the boundary lines on all lots on the Property. The Administrators complied. On May 8, 2006, they filed a Motion for Acceptance of the 2006 Plan (the "2006 Plan"), requesting that the Probate Court approve the plan showing that portion of the Property which was to be conveyed to the Debtor, comprised of 3.310 acres of land known as Lot 2A. The Debtor opposed the Motion for Acceptance.

In the meantime, the Debtor did not vacate Lot 3 or the barn located on that lot. The Administrators filed two separate complaints for contempt against her between April, 2005 and May, 2006 (jointly, the "First Complaint for Contempt"), and the parties filed numerous related oppositions, motions and memoranda. During this time, Debtor's counsel in the probate matter also withdrew, and the Debtor thereafter appeared *pro se* in the Probate Court litigation until 2010.

In an Order dated July 28, 2006, the Probate Court (Cronin, J.) found that the Debtor

10

was not in contempt but that her conduct was "contrary to the spirit of the December 23, 2004 and March 9, 2005 orders." The Probate Court entered a "Contempt Judgment"[3] on that date requiring that, no later than August 12, 2006, the Debtor "must cease and desist from entering into or in any way using of [sic] occupying the structure(s) and land constituting lot three" and "shall remove from Lot 3 all animals, equipment and other personal property[,]" failing which she would have to pay sanctions to the Administrators of $50.00 per day, beginning on August 13, 2006, and continuing each and every day thereafter until full compliance (the "First Contempt Judgment"). The Debtor appealed the First Contempt Judgment.

The Debtor testified at the trial in this proceeding that, following the issuance of the First Contempt Judgment, she was aware of the provisions of the judgment but was unsure of "what my lot consisted of because the survey had not been completed."[4]  She testified that she continued to use the "entire property" during this time out of necessity because the electric meter, water well and driveway she used were all situated, in whole or in part, on the Estate's lots:

> Q:    [You continued to occupy the whole property] . . . with the knowledge that for each day after August 12, 2006 a penalty of $50 a day began to accrue?

---

[3] Although the Probate Court found that the Debtor was not in contempt, the July 28, 2006 Judgment is referred to as a "Contempt Judgment" in Exhibit 2B introduced at trial.

[4] At this time, the 2006 Plan had been completed but had not yet been approved by the Probate Court.

A:      Yes. I guess so, yes.

Q:      So each day when you were occupying that premises in violation of the Court's order you were aware that you were accruing these damages?

A:      I had to go to on the [Estate] property to get to my house.  My water was on the other lots.  My electricity was on the other lots.  The driveway was on the other lots.[5]  So it didn't matter where if – to get into my home I had to violate the order.

When asked if she was using the barn, she replied: "Yes, because part of the barn was on – as far as I knew should have been on my property because there was another acre due to me."   At trial, the Debtor repeatedly voiced her unwillingness to comply with the Probate Court's orders because compliance would have made access to her house and utilities difficult:

Q:      . . . . [Y]ou were doing a lot more than getting in and out of your house.

***

A:      . . . I was going to be held in contempt whether I walked up my driveway or whether I used ten feet of the property.  What would be the difference?  It still wasn't –it–I could not access my home without being in the wrong."

She reiterated this rationale for disregard of the Probate Court orders throughout the trial:

A:      . . . If I was going to be guilty of something, it's – it doesn't matter if I'm violating the order by stepping on my driveway or if I'm violating the order by stepping ten feet in the other direction. . . . You would have had the contempt on me no matter what I did just to get into my home.

_____

[5] As discussed further below, there was only one driveway on the Property which traversed both the Estate's and the Debtor's lots, and the Debtor continued to use the driveway to access her home.

12

On September 5, 2006, the Administrators and certain co-defendants in the Probate Court matter, including members of the Tighe family, filed an Agreement for Judgment which provided, *inter alia*, that the 2006 Plan complied with the Probate Court's Orders dated January 29, 2004 and December 23, 2004; that Lot 2A as shown on the 2006 Plan "defines and incorporates all real property . . . to be conveyed to [the Debtor];" that all real estate taxes on Lot 2A, totaling $22,592.13, must be paid prior to court approval and that the Debtor is entitled to retain and use possession of Lot 2A only.  On the same date, September 5, 2006, the Probate Court entered an Equity Judgment (Manzi, J.) (the "Equity Judgment") on the Complaint for Instructions which incorporated and merged the Agreement for Judgment.

Specifically, the Equity Judgment provided that the Debtor was to " . . . remove any and all personalty and/or livestock [owned by] her, or which may be present [on Lot 3A] . . . from said structures on or before September 20, 2006 . . . and that the [Debtor] shall not interfere in any manner with the physical removal of said structures and the restoration of the premises by the petitioners."  Paragraph 8 of the Equity Judgment also confirmed that the land and buildings devised to the Debtor by Mrs. Tighe " . . . are defined by and entirely contained within Lot 2A of the plan of land entitled 'Plan of Land in North Andover, Mass. Prepared for the Estate of Barbara Tighe, 95 Lacy Street, dated February 21, 2006'" the so-called 2006 Plan.  Accordingly, the Probate Court approved the 2006 Plan which gave the Debtor the right to use and occupy only Lot 2A of the Property as delineated by the Plan, with the remaining lots, numbered 3A, 4A and 5B, belonging to the

13

Estate.  The Debtor testified at trial that she was aware that the Probate Court approved the

2006 Plan, although she was dissatisfied with it.  The Debtor appealed the Equity Judgment

and sought a stay pending appeal of the judgment, and later filed several Motions for

Relief from Judgment pursuant to Mass. R. Civ. P. 60(b).  The Debtor acknowledged at trial

that the Massachusetts Appeals Court affirmed the Equity Judgment.[6]

The Debtor testified at trial that, at the time of the appeal, she was aware of, and

familiar with, the provisions of the Equity Judgment including the requirements that she

was to remove herself, her personal property and her livestock from Lots 3A, 4A and 5B.

Notwithstanding the approval of the 2006 Plan in the Equity Judgment,  which delineated

only Lot 2A as belonging to her, the Debtor still maintained that as of September 5, 2006,

she "was never told what my lot was [and] where it was" because the 2006 Plan had not

yet been approved by the Town of North Andover.   Her dissatisfaction with her

inheritance was still evident at trial in this Court when she summarized her rationale for

continued violation of Probate Court orders including the July 28, 2006 First Contempt

Judgment:

> A:  But what I'm saying is, is that as far as I knew that I inherited a residence
> and the residence was where Mrs. Tighe lived and Mrs. Tighe was able to
> access her residence by a driveway.[7]  She had access to clean water. And it

_____

[6] One of the Probate Court Memoranda introduced into evidence, *see* Exhibit 3A,
indicates that the appeal was dismissed by the Massachusetts Appeals for lack of
prosecution.  In either event, the Equity Judgment is a final order.

[7] A reduction of the 2006 Plan was marked as a chalk at trial. According to the
chalk, only one driveway existed on the Property which originated on Lacy Street,
entered the Property on Lot 3A and continued to the Debtor's house onto Lot 2A.

said in the will that I was to get appurtenances and my attorney had told me that appurtenances are wells or driveways or things of that nature.

Q:  But you were aware, were you not, that the judgment of September 5, 2006 was a final judgment as a result of the affirmation by the Appeals Court?

A: Yes, but . . . [t]hey hadn't done the plan.  It had not gone through the town, so I was under the impression that the town was not going to accept this [2006 Plan] because it wasn't giving me a residence.  I – that was my assumption and obviously I was extremely wrong, but I just assumed that when somebody was left a home they were left a home as whole and not basically a shed that doesn't have electricity, that doesn't have a driveway into it, doesn't have any access to it and the barn that they had said that I had, there was no access to that either.

                                    ***

. . . what I'm saying is is that I just assume that people have rights and we're entitled to certain things . . . you know, in a civilized society.

At some point in time, the 2006 Plan was approved by the Town of North Andover, over the Debtor's objection, and she filed lawsuits in the Essex Superior Court attempting to overturn that decision.

On November 3, 2006, the Administrators filed another Complaint for Civil Contempt (the "Second Complaint for Contempt"), in which they alleged that the Debtor violated the Probate Court order of March 9, 2005, the First Contempt Judgment (dated July 28, 2006) and the Equity Judgment (dated September 5, 2006) by

[c]ontinuing open, exclusive and adverse use of the structures on Lot 3, by denying the plaintiffs . . . access to the parcel, by threatening arrest of the plaintiffs and their . . . invitees, by threatening their persons by releasing her

---

Accordingly, the Debtor had to enter and use Lot 3A whenever entering and exiting the Property to reach her house via the driveway.

dogs against them, and by seeking to collaterally attack the court's order by suing the Plaintiffs in Superior Court to enjoin them from carrying out the Probate Court's Orders and Judgments.

The parties filed various motions with respect to the venue of the hearing on the Second Complaint for Contempt, and the Debtor sought recusal of Judge Manzi who had issued the January 24, 2004 Will Contest order and the Equity Judgment.

The Probate Court conducted a trial on the Administrators' Second Complaint for Contempt on December 17, 2007, which had been rescheduled from a prior date due to the Debtor's complaints of chest pains on the original trial date. The Debtor appeared at the trial *pro se*. The Probate Court (Cronin, J.) issued a Judgment on the Complaint for Civil Contempt (the "Second Contempt Judgment") on February 7, 2008, finding the following:

> At all times relevant and material to this contempt action, Defendant has willfully engaged in a course of conduct which is accurately described as "clear and undoubted" disregard for and violation of the specific terms and requirements of the above described [First Contempt Judgment and the Equity Judgment] including, without limitation:
>
> A. Interfering with the lawful efforts of the duly-authorized agents of the Administrators relating to the agents' attempts to prepare estimates for removal of certain structures on Lot 3A . . . [by releasing on two of their contractors] two boxer dogs each weighing . . . 100 pounds which dogs charged at the contractors. . . ;
> B. Utterly refusing to take any steps whatsoever to vacate Lot 3A or to cease using any portion of it;
> C. Utterly refusing to remove any of her horses or other animals or other personal property from Lot 3A;
> D. . . . unilaterally [choosing] to disregard and knowingly disobey . . . Orders of the Court including, without limitation, the July 28, 2006 Judgment and the September 5, 2006 Judgment.
> E. [She] has no present intention of complying with the aforesaid Judgments of the Court.
> F. Her actions and failures to act regarding the matters alleged in this

16

contempt action are willful and contumacious.
G. She has not paid any money owed as daily sanctions pursuant to the terms
of the July 28, 2006 Contempt Judgment; nor is she otherwise in compliance
with the terms of that Judgment.

The Probate Court found the Debtor guilty of civil contempt for having "willfully

neglected and refused to obey the judgment of the Court." The Court ordered the Debtor

to pay to the Administrators the sum of $26,850 in past due sanctions by March 15, 2008

(representing 537 days from August 13, 2006 to January 31, 2008 at $50 per day). The

Second Contempt Judgment further required the Debtor, not later than February 29, 2008,

to "cease and desist from entering into or in any way using or occupying any portion of the

structure(s) or land consisting of and shown as Lots 3A, 4A, or 5B" on the 2006 Plan and

to remove all horses, livestock and personalty from those lots, failing which she would be

required to pay daily sanctions to the Administrators in the amount of $200 per day

beginning on March 1, 2008 until full compliance. Lastly, the Second Contempt Judgment

provided that "the Co-Administrators . . . are hereby provided with a Judicial Lien on [the

Debtor's] interest, if any, in the real estate shown as Lot 2A on the 2006 Plan . . . , in order

to secure timely payment to the Estate of all sums owed to it pursuant to the terms of this

Judgment."

During this time period, the Debtor filed at least four appeals in the Massachusetts

Appeals Court and at least two requests for further appellate review in the Massachusetts

Supreme Judicial Court in which she raised several issues, including whether the Probate

Court trial judge had authority to act. All appeals were decided against the Debtor.

Further noncompliance by the Debtor with the Probate Court orders, and more litigation between the parties followed the Second Contempt Judgment. On September 22, 2009, Field filed another Complaint for Civil Contempt (the "Third Complaint for Contempt") against the Debtor for her continued willful interference with his administration of the Tighe Estate and for her continued failure to comply with prior Probate Court orders.[8]  The Debtor filed a Motion for Summary Judgment, a Motion to Dismiss and a Special Motion to Dismiss the Third Complaint for Contempt, all of which were denied by the Probate Court.  A trial was conducted on the Third Complaint for Contempt on January 14, 2010, during which the Debtor orally moved for recusal of the presiding trial judge.[9]  The Court denied the recusal motion.

On March 26, 2010, the Probate Court issued a Judgment (Cronin, J.) (the "Third Contempt Judgment") finding the Debtor, again, guilty of civil contempt for her refusal to obey the First and Second Contempt Judgments and the Equity Judgment.  In his lengthy findings, the trial judge noted that the Debtor had been ordered to vacate certain portions of the Property and to remove livestock and property more than five years ago and that she had not complied with *any* of the requirements of the two prior contempt judgments.

---

[8] At trial, the parties referenced a filing date of December 22, 2009.  The Probate Court orders introduced at trial, however, reflect a filing date of September 22, 2009.

[9] The Debtor sought recusal of the trial judge, Cronin, J., on the basis that he, as well as Probate Judge Manzi, members of the North Andover Planning Board and other professionals connected with the Tighe Estate, were named defendants in a lawsuit commenced by the Debtor in the United States District Court for the District of Massachusetts.  In a Memorandum and Order dated March 15, 2010 (Woodlock, J.), the U.S. District Court dismissed the action.

Further, he found that the Debtor was a "knowledgeable and experienced self-represented litigant" who had "made it clear at the contempt trial that she has no intention of complying with the prior Court Orders" and that "[s]he continues to argue, in essence, that her analysis of the facts and law should supersede that of the Appeals Court and of the Supreme Judicial Court . . . . " Lastly, the Probate Court found that the Debtor, at all relevant times, had the "ready ability and capacity to comply with the Judgments, but she adamantly and perpetually chooses not to do so."

The Probate Court found that the Debtor owed the Administrator $171,050 in unpaid court ordered sanctions for the period of August 13, 2006 through February 7, 2010 and ordered the Debtor to repay $20,000 of that amount by May 14, 2010, with the terms of payment of the remaining balance to be determined at a later hearing following the Debtor's submission of financial statements to the court. The Third Contempt Judgment further provided that the Debtor was to cease and desist from entering onto or using any portion of Lots 3A, 4A or 5B and to remove all livestock and personal property from those lots. Additionally, the Probate Court committed the Debtor to jail for ninety (90) days until she complied with the $20,000 payment order and the order to vacate and remove items from Lots 3A, 4A and 5B. The sentence was suspended until May 27, 2010 on certain conditions. The court also provided the Administrator with a judicial lien on the Debtor's interest in Lot 2A to secure timely payment to the Estate and ordered the Debtor to pay the Estate its reasonable attorney's fees and costs. The Debtor appealed the Third Judgment of Contempt; the judgment was affirmed on appeal.

The Probate Court conducted a further hearing on the Debtor's compliance with the Third Contempt Judgment on May 27, 2010, following which it issued a Further Judgment on the same date.   During the hearing, the Debtor admitted twice that she had not complied with the Third Contempt Judgment, and the court also found that there was additional credible evidence of her "flagrant" noncompliance with that judgment. Numerous photographs were introduced into evidence at the compliance hearing which clearly showed the Debtor's continued use of the Estate's lots.   She also failed to produce financial statements and to respond to the Administrator's financial discovery requests. As a result, the Probate Court revoked the previous suspension of the jail sentence and committed the Debtor to jail for ninety (90) days or until she purged herself of the contempt by: (1) paying $20,000 of the sanction award; and (2)  providing  written confirmation that she had given written instructions to her agents to remove from Lots 3A, 4A and 5B all livestock, personalty and related items.  Additionally, the Further Judgment provided that the Debtor was to pay the Administrator's counsel $10,739 in attorney's fees by October 1, 2010 (the three Contempt Judgments and the Further Judgment hereinafter collectively referred to as the "Contempt Judgments").

The Debtor spent fourteen days in jail.  She was released after she paid the Estate $20,000, a sum given to her by her father, and after her husband removed her animals and personalty from the Estate's lots.[10]     Issues regarding her use of those lots persisted,

---

[10] In the Complaint, the Administrator computed the debt at $187,050, representing the Third Contempt Judgment amount of $171,050, less the $20,000 paid by the Debtor following her incarceration ($151,050), plus statutory post-judgment interest.

however. Following her release from jail, in July, 2010, the police arrived at the Property

to remove the electric meter she used which was situated on Lot 4A.  As a result, she had

no access to power or water.[11]  In December, 2010, Lots 3A, 4A and 5B were sold to a third

party for $535,000, and a dispute arose between the Debtor and the buyers concerning her

use of the well and the driveway. The Debtor commenced an action in Land Court against

the buyers.  In July, 2011, the Debtor installed her own driveway on Lot 2A.

The Debtor borrowed sums to pay $10,000 for installation of the new driveway,

$3,500 for access to electric service, and $8,500 for a new well on Lot 2A.  When questioned

by the Court regarding why she did not take those actions sooner, the Debtor testified that

she did not have the money to do so and, notably, because she believed she was entitled

to more land than the 2006 Plan provided:

> Q:    You wanted the whole thing?
>
> A:    Well, I was told that I was getting the whole front portion of the
>       property.

She added that she litigated these matters so extensively to get what she believed was her

rightful devise.  The Debtor also emphasized in her testimony that she resorted to litigation

against various parties in this matter because she was repeatedly told by the Estate and the

Town of North Andover that she "is not the true owner" of Lot 2A due to the absence of

---

[11] The record is unclear regarding the Debtor's access to and use of power and water following removal of the electric meter.  She apparently had an agreement with the Estate for limited use of the driveway while she made arrangements to build her own separate driveway.

a deed from the Estate to her.[12]  In support, she introduced the Complaint through which

the Estate made general allegations regarding the Debtor's "adverse use and occupation

of real estate belonging to the estate" and did not differentiate between the Estate's lots and

Lot 2A.  It is unclear from the record why a deed has never been executed in favor of the

Debtor for Lot 2A.

Field also testified at trial.  He had represented Mrs. Tighe and the corporation

which operated the farm on the Property for several years prior to her death.  He testified

that the documents presented to the Probate Court in connection with Mrs. Tighe's Will

were an accurate reflection of Mrs. Tighe's intentions with respect to the Debtor.  During

the Will Contest, he considered the Estate's interests to be aligned with those of the Debtor.

As chronicled above, the relationship between the parties quickly soured after the Will was

admitted into Probate.

Field testified in detail about his efforts to record the 2006 Plan.  Recordation of the

Plan required payment by the Estate of outstanding real estate taxes on Lot 2A because the

Debtor failed to pay them as well as approval of the Plan by the Town of North Andover

Planning Board.  The Planning Board determined that the 2006 Plan complied with all

applicable zoning laws and regulations and approved it following a Planning Board

hearing at some point in 2008.  Field thereafter recorded the 2006 Plan at the Essex County

(Northern) Registry of Deeds.    According to Field, the Debtor was unhappy with the

---

[12] This issue also arose in the context of the Estate's objection to the Debtor's
homestead objection which the Court overruled and determined in the Debtor's favor.

course of events and attempted to thwart the approval and recording process by suing the Town of North Andover and by making visits to town offices. During this time, Field testified, that he personally witnessed the Debtor using the Estate's lots which led him to file the three contempt complaints against her. Field also testified that he never advised the Debtor that she did not own Lot 2A, testimony disputed by the Debtor.

Field prepared an estate tax return and an inventory in 2003 for the Estate. He testified that he received an appraised value of $825,000 for the Estate's lots (consisting of Lots 3A, 4A and 5B). Field maintained that the Estate incurred a loss of $290,000, representing the difference between the appraised value of $825,000 and the eventual sale price for those lots of $535,000, which was directly attributable to the conduct of the Debtor. The Debtor, in contrast, testified that the $825,000 appraisal did include Lot 2A which was not part of the 2010 sale. Field did not introduce the appraisal or the purchase and sale agreement into evidence and did not demonstrate through other evidence that the reduction in value was solely attributable to the Debtor. Field also testified that the $20,000 payment made by the Debtor which secured her release from jail in 2010 is the only payment she has made with respect to the Contempt Judgments.

## IV. POSITIONS OF THE PARTIES

Field argues that the factual determinations made by the Probate Court, detailed in the exhibits introduced at trial and illuminated by trial testimony, establish that the debt owed to the Estate arose as a result of the Debtor's willful and malicious injury. He further contends that the Debtor is foreclosed by collateral estoppel from asserting in this

23

proceeding her prior excuses for noncompliance with the Probate Court's orders, namely that she believed that she was entitled to the whole premises and that she needed access to the Estate's portion of the Property to access her home and obtain utilities. Field maintains that these are positions which have been resolved against the Debtor by final judgments and, in any event, they do not constitute a just cause or excuse for her willful and malicious injury to the Estate.

Field also asserts that the Estate was damaged by the loss in value of Lots 3A, 4A and 5B during the extensive litigation with the Debtor ($290,000). That amount is $100,000 greater than the amount set forth in the Estate's proof of claim and in the prayer for relief in the Complaint, i.e., $187,050.

The Debtor maintains that she resorted to the legal system to the best of her ability as a *pro se* litigant but, given her lack of legal training and limited college level education, she became overwhelmed to the point where her legal responses became "disorderly and often times not sensible . . . ." The Debtor argues that her sole intent was to secure the necessary appurtenances of water, electricity and access to her property and at no time did she act maliciously or intend to harm the Estate. Lastly, she asserts that she did not vacate the Estate's land where the appurtenances were located or stop her opposition to the Probate Court's "wrong finding" because she feared she and her family would have to move out of the home given to her by Mrs. Tighe.

## V. DISCUSSION

As stated by this Court at the outset of the trial, the doctrine of collateral estoppel

applies in bankruptcy dischargeability proceedings. Grogan v. Garner, 498 U.S. 279, 284 n.11 (1991). The Probate Court entered numerous judgments, including the Contempt Judgments, following extensive litigation between the same parties where each had a full and fair opportunity to litigate all issues between them concerning the Will and the Debtor's use and occupancy of her portion of the Property. Those judgments, after the resolution of all appeals, constitute final judgments on the merits. *See generally* Backlund v. Stanley–Snow (In re Stanley–Snow), 405 B.R. 11, 18 (B.A.P. 1st Cir. 2009)("To apply the doctrine [of collateral estoppel], a court must determine that: (1) there was a valid and final judgment on the merits in the prior adjudication; (2) the party against whom estoppel is asserted was a party (or in privity with a party) to the prior litigation; (3) the issue in the prior adjudication is identical to the issue in the current litigation; and (4) the issue in the prior litigation was essential to the earlier judgment.")(citing Alba v. Raytheon Co., 441 Mass. 836, 809 N.E.2d 516, 521 (2004)). The Probate Court determined the scope of the devise to the Debtor, her liability for contempt for her violation and evasion of court orders and the amount of the debt owed to the Estate. The Probate Court judgments have a binding and preclusive effect in this adversary proceeding with respect to those issues.

Additionally, the Rooker-Feldman doctrine bars this Court from acting as an appellate tribunal with respect to the judgments as it "'strip[s] federal subject matter jurisdiction over lawsuits that are, in substance, appeals from state court decisions.'" In re Sanders, 408 B.R. 25, 33 (Bankr. E.D. N.Y. 2009)(quoting Book v. Mortg. Elec. Registration Sys., 608 F. Supp. 2d 277, 288 (D. Conn. 2009)(citing Hoblock v. Albany Cnty. Bd. of

Elections, 422 F.3d 77, 84 (2d Cir. 2005)). Moreover, the Full Faith and Credit Act, 28 U.S.C.

§ 1738, requires a federal court to give the same preclusive effect to a state court judgment

as another court of that State would give. "Congress has specifically required all federal

courts to give preclusive effect to state-court judgments whenever the courts of the State

from which the judgments emerged would do so[.]" Allen v. McCurry, 449 U.S. 90, 96

(1980).

Accordingly, the sole matter for determination here is whether the Debtor's

violations of the various Probate Court orders constitute "willful and malicious injury" by

the Debtor to the Estate such that the debt should be excepted from discharge pursuant to

11 U.S.C. § 523(a)(6). This is a separate and distinct legal theory and claim than the matters

which were litigated and determined in the Probate Court. *See* In re Stanley–Snow, 405

B.R. at 18 (collateral estoppel requires the issue in the prior adjudication to be identical to

the issue in the current litigation).

This Court recently set forth the standard for determining an exception to discharge

pursuant to 11 U.S.C. § 523(a)(6) in Cowart v. Elias (In re Elias), 494 B.R. 595 (Bankr. D.

Mass. 2013). The Court stated:

> Section 523(a)(6) of the Bankruptcy Code excepts from discharge any debt
> that results from "willful and malicious injury by the debtor to another entity
> or to the property of another entity." 11 U.S.C. § 523(a)(6). The terms
> "willful" and "malicious" are two distinct elements, and each must be
> proven to establish an exception to discharge. Fischer v. Scarborough (In re
> Scarborough), 171 F.3d 638, 641 (8th Cir. 1999). The [p]laintiff bears the
> burden of proving her claim nondischargeable under § 523(a)(6) by a
> preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 287, 111 S.Ct.
> 654, 112 L.Ed.2d 755 (1991).

26

In <u>Kawaauhau v. Geiger</u>, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), the United States Supreme Court addressed the definition of the term "willful." The Court determined that the term "willful" modifies the word "injury" in § 523(a)(6) and therefore "nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." <u>Id</u>. at 61, 118 S. Ct. 974 (emphasis in original). Thus, recklessly or negligently inflicted injuries are not excepted from discharge under § 523(a)(6). <u>Id</u>. at 64, 118 S.Ct. 974. *See also* <u>Trenwick America Reinsurance Corp. v. Swasey (In re Swasey)</u>, 488 B.R. 22 (Bankr. D. Mass. 2013).

In <u>Read & Lundy, Inc. v. Brier (In re Brier)</u>, 274 B.R. 37 (Bankr. D. Mass.2002), this Court reviewed post-<u>Geiger</u> case law with respect to the willful element of § 523(a)(6):

> In <u>McAlister v. Slosberg (In re Slosberg)</u>, 225 B.R. 9 (Bankr. D. Me. 1998), the bankruptcy court observed that [the Supreme Court in <u>Geiger</u>] ... did not indicate whether the willfulness element includes "acts intentionally done and which are known by the actor to be 'substantially certain to cause injury.'" <u>Id</u>. at 18 (emphasis in original). Noting that the "substantially certain" formulation had been adopted in most post-<u>Geiger</u> decisions, <u>id</u>. n.12, and is prominent in the Restatement (Second) of Torts § 8A, the bankruptcy court in <u>Slosberg</u> adopted that formulation. It concluded that "a debtor who intentionally acts in a manner he knows, or is substantially certain, will harm another may be considered to have intended the harm and, therefore, to have acted willfully within the meaning of § 523(a)(6)." <u>Id</u>. at 19 (footnote omitted).

<u>Brier</u>, 274 B.R. at 43–44.

The United States Court of Appeals for the First Circuit in <u>Printy v. Dean Witter Reynolds, Inc</u>., 110 F.3d 853, 859 (1st Cir.1997), held that the element of malice in § 523(a)(6) requires that the creditor show that the willful injury was caused without justification or excuse.

<u>Elias</u>, 494 B.R. at 601-602.  The <u>Printy</u> court added that "personal hatred, spite or ill-will"

need not be established to find the element of malice. <u>Printy</u>, 110 F. 3d at 859.

In <u>Bauer v. Colokathis (In re Colokathis)</u>, 417 B.R. 150 (Bankr. D. Mass. 2009), this

Court construed <u>Geiger</u> and <u>Printy</u>, as well as post-<u>Geiger</u> cases such as <u>Slosberg</u> and

concluded that for an exception to discharge under 11 U.S.C. § 523(a)(6) to apply, the

creditor has the burden of showing that "1) the creditor suffered injury; 2) the debtor

intended to cause the injury or that there was substantial certainty that the injury would

occur; and 3) the debtor had no justification or excuse for the action resulting in injury." <u>Id</u>.

at 158.

There is no dispute that the Debtor violated a number of Probate Court orders which

led to multiple findings of contempt and her eventual incarceration.  A debtor's failure or

refusal to obey a court order, alone, is not necessarily determinative of a finding of willful

and malicious injury under § 523(a)(6).  "Section 523(a)(6) does not make 'contempt'

sanctions nondischargeable *per se*, and neither does any other subpart of section 523(a))."

<u>Suarez v. Barrett (In re Suarez)</u>, 400 B.R. 732, 737 (B.A.P. 9th Cir. 2009), *aff'd* 2013 WL

3070518 (9th Cir. June 20, 2013).  *But see* <u>PRP Wine Int'l, Inc. v. Allison (In re Allison)</u>, 176

B.R. 60, 64 (Bankr. S.D. Fla. 1994)("Failure to comply with court directives contained in an

injunction order satisfies the definition of 'willful and malicious' within 11 U.S.C. §

523(a)(6).").[13]  *See also* <u>Liddell v. Peckham (In re Peckham)</u>, 442 B.R. 62, 84 (Bankr. D. Mass.

2010), in which this Court noted that "courts addressing the issue of whether contempt

judgments are nondischargeable are not uniform in their analysis" and concluded that "the

case law is fact driven, and the holdings in the decisions . . . often are the result of both

egregious and affirmative misconduct by debtors in contravention of court orders or

[13] The Court notes that this case was decided prior to <u>Geiger</u>.

injunctions . . . . ").

With respect to the first element of the "willful" injury test of § 523(a)(6), i.e., that

the Estate suffered an injury, the Court finds that Field has sustained his burden of proof

by more than a preponderance of the evidence.  The injury to the Estate was the Debtor's

continuous and unabated invasion of and interference with its exclusive possession of its

land following the Probate Court's issuance of the First Contempt Judgment on July 28,

2006, which required her to "cease and desist from entering into or in any way using of

[sic] occupying the structure(s) and land constituting lot three" and to "remove from Lot

3 all animals, equipment and other personal property."[14] The Equity Judgment was issued

five weeks after the First Contempt Judgment, on September 5, 2006, and it confirmed that

the Debtor's devise was "defined by and entirely contained in Lot 2A."   The evidence

established at trial irrefutably demonstrates that the Debtor continuously traversed and

used land in excess of that devise which belonged to the Estate during the summer of 2006

through the spring of 2010.  Although not specifically labeled as such in the Contempt

Judgments, this Court finds that the Debtor's actions, following the entry of the First

Contempt Judgment, constituted intentional and continuous trespass on the Estate's land.

*See* Saab v. Kostorizos, 06 MISC 335736 (HMG), 2012 WL 5907075 (Mass. Land Ct. Nov. 26,

2012): In Saab, the court stated:

> At the heart of an action for trespass to real property is that the defendant
> intentionally entered the land of another, without privilege to do so,

---

[14] As stated above, Lot 3 was the original designation of the Debtor's lot and was
later renumbered as Lot 2A with the approval of the 2006 Plan.

29

regardless of any harm caused to the land. <u>Gage v. Westfield</u>, 26 Mass. App.
Ct. 681, 695 n.8 (1988). The tort is actionable even where the trespasser is
ignorant that his invasion violates the title or right of possession of the
plaintiff. <u>United Electric Light Co. v. Deliso Const. Co.</u>, 315 Mass. 313, 318
(1943). An ongoing invasion of the plaintiff's land without legal right may
constitute a continuing trespass, and an 'intentional and continuing trespass
to real estate may be enjoined. . . . Damages are usually inadequate because
the plaintiff is not to be compelled to part with his property for a sum of
money.'

<u>Id</u>. at *15 (quoting <u>Chesarone v. Pinewood Builders, Inc</u>., 345 Mass. 236, 240 (1962);

Massachusetts Practice, Summary of Basic Law, c. 14 § 17.24).    Significantly, the

Restatement (Second) of Torts § 158 (1965) provides:

> One is subject to liability to another for trespass, irrespective of whether he
> thereby causes harm to any legally protected interest of the other, if he
> intentionally
> (a) enters land in the possession of the other, or causes a thing or a third
> person to do so, or
> (b) remains on the land, or
> (c) fails to remove from the land a thing which he is under a duty to remove.

Restatement (Second) of Torts § 158 (1965).

The Debtor engaged in each of the enumerated examples of intentional trespass

provided in the Restatement: she repeatedly entered the Estate's lots, stored her animals

and equipment there, persisted in using portions of the Estate lots for years, and failed to

remove her property therefrom despite repeated mandates to do so.   In doing so, she

injured the Estate by invading its interest in exclusive possession of its land.  *See generally*

<u>Amaral v. Cuppels</u>, 64 Mass. App. Ct. 85, 90-91 (2005)(trespass is an invasion of the

plaintiff's interest in the exclusive possession of his land).  The Probate Court effectively

decided injury to the Estate when it issued the Contempt Judgments which imposed

30

monetary sanctions on the Debtor, payable directly to the Administrator, and enjoined her from continued unauthorized entry and use of the Estate's land. The Court finds that both the injunctive relief and the monetary sanctions were imposed to redress and compensate the Estate for her entry onto Estate land and its lost use of same. Indeed, in the Debtor's post-trial brief, she acknowledges that the amounts assessed against her by the Probate Court were compensatory and not punitive fines.

The Debtor's pattern of protracted and vexatious litigation in numerous courts after the entry of the First Contempt Judgment, both against the Estate and third parties, also caused the Estate injury in the form of costs and fees incurred to prosecute, defend and monitor those actions. Additionally, the Estate's entanglement in these various lawsuits delayed the Administrator from selling the Estate's portion of the Property and from fulfilling his fiduciary obligation to implement the provisions of Mrs. Tighe's Will, resulting in further injury to the Estate.

The second element of the "willful" injury test is whether the Debtor intended to injure the Estate or whether there was a substantial certainty that the injury to it would result from her conduct. As stated above, the injury to the Estate was the Debtor's trespass, the resulting deprivation of its right to possess its portion of the Property, and her incessant litigation strategy following the First Contempt Judgment. The Debtor's intent to interfere with and deprive the Estate of its land and delay the recording and implementation of the 2006 Plan is manifestly clear from the findings of the Probate Court and the Debtor's own testimony.

The Probate Court cited numerous examples of the Debtor's efforts to deprive the Estate of its land including: the Debtor's release of her dogs on the Estate's contractors who were working on Lot 3A, her use of the portions of the driveway and the well situated on the Estate's lots, her failure to vacate the Estate's lots and/or remove property and livestock therefrom and her failure to pay daily sanctions.   She undertook all of these actions to deprive the Estate of its land so that she could use it as her own.  The Debtor's trial testimony also supports the finding of willful injury.  She testified that she was aware of and knowledgeable about the established boundaries of the Property, the provisions of the various Contempt Judgments, and of the imposition of daily sanctions for her noncompliance but that she nonetheless continued her unauthorized entry to take from the Estate what she continued to frivolously insist was hers.

As noted by the Probate Court, the Debtor was a "knowledgeable and experienced self-represented litigant." She systematically employed a vigorous litigation strategy over a period of years through which she challenged and then disregarded adverse rulings while she pursued her goal of using portions of the Estate's land to which she believed she was rightfully entitled.  She initiated litigation in numerous trial and appellate courts, filed countless pleadings, sought recusal of and initiated suit against at least two  judges who had ruled against her, sued the Town of North Andover in an attempt to prevent the Estate from recording the 2006 Plan and generally caused the Estate to fund the defense or prosecution of multiple actions while she enjoyed the use of its land without any compensation to the Estate.  Accordingly, the Court finds that the Debtor intended to injure

32

the Estate and it need not reach the issue of whether injury to the Estate was substantially

certain to occur from the Debtor's actions.

     This case is distinguishable from <u>Trenwick Am. Reinsurance Corp. v. Swasey (In re</u>

<u>Swasey)</u>, 488 B.R. 22 (Bankr. D. Mass. 2013), in which this Court considered whether a

judgment under Mass. Gen. Laws ch. 93A entered against the debtor by the United States

District Court for the District of Massachusetts collaterally estopped the debtor from

litigating an action to except the judgment from discharge under § 523(a)(6), where the

district court "'determined that the debtor . . . , disavowed a reinsurance contract in bad

faith, raised sham defenses, gave false and misleading testimony, and engaged in other

outrageous pre- and post-litigation misconduct in a deliberate effort to frustrate Plaintiffs'

contractual rights.'" <u>Id</u>. at 25.  The Bankruptcy Court determined that "[a]lthough the

District Court made detailed findings about the Debtor's actions, this Court is unable to

discern whether he specifically intended to injure the Plaintiffs . . . ." <u>Id</u>. at 45.  Unlike the

District Court decision and the litigation history in <u>Swasey</u>, which did not involve multiple

contempt proceedings, the Probate Court judgments here do establish that the Debtor

intended to injure the Estate by continuously depriving it of its land while she was aware

that daily sanctions for doing so were accruing against her.

     This case is more analogous to two cases from the District of Massachusetts in which

debts arising from a debtor's trespass were excepted from discharge pursuant to §

523(a)(6).  *See* <u>Caci v. Brink (In re Brink)</u>, 333 B.R. 560 (Bankr. D. Mass. 2005).  In <u>Brink</u>, this

Court considered the dischargeability of a judgment debt arising out of Chapter 7 debtors'

trespass, when they intentionally cut down trees on their neighbor's property.  The Court

ruled that the debtors "acted with an intent to cause injury to [their neighbor's] property

and that they acted without just cause or excuse having failed to obtain the permission

from [their neighbor] to enter upon his property." Id. at 571.  *See also* Bairstow v. Sullivan

(In re Sullivan), 198 B.R. 417 (Bankr. D. Mass. 1996).  In Sullivan, the court excepted the

debt in question from discharge pursuant to § 523(a)(6) because the debtor knew that a

continuing trespass was being committed by his agents and employees and did nothing

about it. The court concluded:

> It was proven at the trial that agents, employees or those under the direction
> and control of the debtor had intentionally and deliberately trespassed upon
> land of the Plaintiffs and damaged their property. The conduct also
> contained aggravating features making it malicious. The trespass and
> injurious activities continued for several months after it was brought to the
> attention of the Debtor's workcrew a trespass existed. I therefore conclude
> the conduct was willful and malicious within the meaning of section
> 523(a)(6), and hence non-dischargeable.

Id. at 423 (footnote omitted).

Lastly, the Court finds that the Plaintiff established that the Debtor acted without

just cause or excuse for purposes of the "malicious" component of § 523(a)(6).  *See* Bauer

v. Colokathis, 417 B.R. 150, 158 (Bankr. D. Mass. 2009).  In Liddell v. Peckham (In re

Peckham), 442 B.R. 62 (Bankr. D. Mass. 2010), this Court considered whether a debtor

willfully and maliciously injured the plaintiff by failing to respond to discovery in aid of

execution of the plaintiff's judgment and subjecting himself to contempt and civil arrest.

The Court determined that the debtor's contravention of court orders was not the result of

34

egregious and affirmative misconduct but rather the result of the "virtual paralysis" of the debtor who suffered from depression. Unlike the debtor in <u>Peckham</u> against whom a default judgment was entered and who "buried his head in the sand and presumably hoped that the whole matter would go away," the Debtor here fully litigated the disputed matters long after the adjudication of her rights in the Property was final and engaged in a pattern of defiant, obstructive and injurious behavior which targeted the Estate to achieve her goal of obtaining the portions of the Property she wanted.

The Debtor offered a number of excuses for her conduct, including the need to access a full driveway and utilities, the cost of installing her own driveway and well, and the need to acquire proof of her ownership of Lot 2A. These excuses merely reflect the Debtor's unshakable belief throughout her years of long conflict with the Estate that she was entitled to more land and appurtenances than were awarded to her under the Will. This is not to say that the Debtor was not entitled to vigorously pursue legitimate legal strategies to prevail when the dispute between the parties arose. Indeed, the Debtor's initial stance could be considered rational given the ambiguous legal description of the devise, her past use of the Property, including the barn, and her long service to and relationship with Mrs. Tighe. Her efforts to secure what she thought was her rightful inheritance, however, morphed with the passage of time into a fanatical crusade in which she sued multiple parties whom she believed impeded her goal of securing more than Lot 2A. The Debtor's scorched earth litigation tactics were employed well beyond the time when the parties' rights in the Property were finally determined by the Probate Court.

35

The Debtor's trial testimony, as detailed above, is replete with examples of her

unwillingness to accept, even now, the rulings of the Probate Court.  Indeed, the Probate

Court considered and discounted these excuses and finally imposed a jail sentence which

ultimately forced her to cease her trespass upon the Estate's land.  It is also clear from the

pleadings the Debtor filed in this adversary proceeding, including the Joint Pretrial

Memorandum, that she persists in arguing the scope of her devise.  The Debtor's beliefs

cannot be considered "just cause or excuse" for her injury to the Estate and her blatant and

willful contempt of court orders.  Rather, her actions constitute the type of aggravated and

unjustified misconduct which warrants a finding of malice under § 523(a)(6).

> A person who persists unabated in unlawful conduct, after the entry of a
> court order specifically and unambiguously enjoining such conduct, and who
> continues her unlawful conduct in violation of further orders of the court,
> cannot be characterized as the 'honest but unfortunate' debtor whom
> Congress intended to favor with the extraordinary relief of a discharge in
> bankruptcy.

Bundy American Corp. v. Blankfort (In re Blankfort), 217 B.R. 138, 146 (Bankr. S.D.

N.Y. 1998).

## VI. CONCLUSION

For all of the above stated reasons, the Court finds that Field has established by a

preponderance of the evidence that the debt owed to the Estate, as determined by the

Probate Court in the Contempt Judgments, is the result of the Debtor's willful and

malicious injury to the Estate.  Accordingly, the debt owed to the Estate, in the amount set

forth in its proof of claim and in the Complaint, is nondischargeable under

36

11 U.S.C. § 523(a)(6).  To the extent Field seeks to except a greater amount from discharge based upon an appraisal which he did not introduce into evidence and which is not referenced in the Estate's proof of claim or in the Complaint, that request is denied.  The Court shall enter a judgment in favor of Field.

By the Court,

Dated: October 9, 2013

Joan N. Feeney
United States Bankruptcy Judge